UNITED STATES, PETITIONER
v.
JAMES DANIEL GOOD REAL PROPERTY ET AL.
 No. 92-1180
 SUPREME COURT OF THE UNITED STATES
 
 510 U.S. 43
 114 S. Ct. 492
 October 6, 1993, Argued
 December 13, 1993, Decided
 ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT.
 971 F.2d 1376, affirmed in part, reversed in part, and remanded.
 Fifth Amendment's due process clause held generally to prohibit Federal Government from seizing real property in civil forfeiture, pursuant to 21 USCS 881(a)(7), without prior notice and hearing.
 Edwin S. Kneedler argued the cause for the United States. With him on the brief were Solicitor General Days, Acting Solicitor General Bryson, and Acting Assistant Attorney General Keeney.
 Christopher J. Yuen argued the cause and filed a brief for respondents.
 A brief of amici curiae urging reversal was filed for the State of Kentucky et al. by Chris Gorman, Attorney General, and David A. Sexton, Assistant Attorney General, Malaetasi Togafau, Attorney General of American Samoa, Grant Woods, Attorney General of Arizona, Daniel E. Lungren, Attorney General of California, Domenick J. Galluzzo, Acting Chief State's Attorney of Connecticut, Pamela Carter, Attorney General of Indiana, Robert T. Stephan, Attorney General of Kansas, Richard P. Ieyoub, Attorney General of Louisiana, J. Joseph Curran, Jr., Attorney General of Maryland, Scott Harshbarger, Attorney General of Massachusetts, Frank J. Kelley, Attorney General of Michigan, Mike Moore, Attorney General of Mississippi, Joseph P. Mazurek, Attorney General of Montana, Don Stenberg, Attorney General of Nebraska, Jeffrey R. Howard, Attorney General of New Hampshire, Tom Udall, Attorney General of New Mexico, Heidi Heitkamp, Attorney General of North Dakota, Ernest D. Preate, Jr., Attorney General of Pennsylvania, and Joseph B. Myer, Attorney General of Wyoming.
 Briefs of amici curiae urging affirmance were filed for the American Civil Liberties Union et al. by Steven Alan Reiss, Richard A. Rothman, Katherine Oberlies, Steven R. Shapiro, and John A. Powell; for the Institute for Justice by William H. Mellor III and Clint Bolick; and for the National Association of Criminal Defense Lawyers by Richard J. Troberman and E. E. Edwards III.
 JUDGES: KENNEDY, J., delivered the opinion for a unanimous Court with respect to Parts I and III, and the opinion of the Court with respect to Parts II and IV, in which BLACKMUN, STEVENS, SOUTER, and GINSBURG, JJ., joined. REHNQUIST, C. J., filed an opinion concurring in part and dissenting in part, in which SCALIA, J., joined, and in which O'CONNOR, J., joined as to Parts II and III, post, p. 65. O'CONNOR, J., post, p. 73, and THOMAS, J., post, p. 80, filed opinions concurring in part and dissenting in part.
 KENNEDY
 [46] [497] JUSTICE KENNEDY delivered the opinion of the Court.
 
 
 1
 The principal question presented is whether, in the absence of exigent circumstances, the Due Process Clause of the Fifth Amendment prohibits the Government in a civil forfeiture case from seizing real property without first affording the owner notice and an opportunity to be heard. We hold that it does.
 
 
 2
 A second issue in the case concerns the timeliness of the forfeiture action. We hold that filing suit for forfeiture within the statute of limitations suffices to make the action timely, and that the cause should not be dismissed for failure to comply with certain other statutory directives for expeditious prosecution in forfeiture cases.
 
 
 3
 * On January 31, 1985, Hawaii police officers executed a search warrant at the home of claimant James Daniel Good. The search uncovered about 89 pounds of marijuana, marijuana seeds, vials containing hashish oil, and drug paraphernalia. About six months later, Good pleaded guilty to promoting a harmful drug in the second degree, in violation of Hawaii law. Haw. Rev. Stat. § 712-1245(1)(b) (1985). He was sentenced to one year in jail and five years' probation, and fined $ 1,000. Good was also required to forfeit to the State $ 3,187 in cash found on the premises.
 
 
 4
 On August 8, 1989, 4 1/2 years after the drugs were found, the United States filed an in rem action in the United States District Court for the District of Hawaii, seeking to forfeit Good's house and the 4-acre parcel on which it was situated. The United States sought forfeiture under 21 U.S.C. § 881(a)(7), on the ground that the property had been used to commit or facilitate the commission of a federal drug offense. n1
 
 
 5
 - - - - - - - - - - - - - - Footnotes - - - - - - - - - -
 
 
 6
 n1 Title 21 U.S.C. § 881(a)(7) provides:
 
 
 7
 "(a) . . .
 
 
 8
 "The following shall be subject to forfeiture to the United States and no property right shall exist in them:
 
 
 9
 "(7) All real property, including any right, title, and interest (including any leasehold interest) in the whole of any lot or tract of land and any appurtenances or improvements, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this subchapter punishable by more than one year's imprisonment, except that no property shall be forfeited under this paragraph, to the extent of an interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner."
 
 
 10
 - - - - - - - - - - - - End Footnotes- - - - - - - - -
 
 
 11
 [47] On August 18, 1989, in an ex parte proceeding, a United States Magistrate Judge found that the Government had established probable cause to believe Good's property was subject to forfeiture under § 881(a)(7). A warrant of arrest in rem was issued, authorizing seizure of the property. The warrant was based on an affidavit recounting the fact of Good's conviction and the evidence discovered during the January 1985 search of his home by Hawaii police.
 
 
 12
 [498] The Government seized the property on August 21, 1989, without prior notice to Good or an adversary hearing. At the time of the seizure, Good was renting his home to tenants for $ 900 per month. The Government permitted the tenants to remain on the premises subject to an occupancy agreement, but directed the payment of future rents to the United States Marshal.
 
 
 13
 Good filed a claim for the property and an answer to the Government's complaint. He asserted that the seizure deprived him of his property without due process of law and that the forfeiture action was invalid because it had not been timely commenced under the statute. The District Court granted the Government's motion for summary judgment and entered an order forfeiting the property.
 
 
 14
 The Court of Appeals for the Ninth Circuit affirmed in part, reversed in part, and remanded for further proceedings. 971 F.2d 1376 (1992). The court was unanimous in holding that the seizure of Good's property, without prior notice and a hearing, violated the Due Process Clause.
 
 
 15
 [48] In a divided decision, the Court of Appeals further held that the District Court erred in finding the action timely. The Court of Appeals ruled that the 5-year statute of limitations in 19 U.S.C. § 1621 is only an "outer limit" for filing a forfeiture action, and that further limits are imposed by 19 U.S.C. §§ 1602-1604. 971 F.2d at 1378-1382. Those provisions, the court reasoned, impose a "series of internal notification and reporting requirements," under which "customs agents must report to customs officers, customs officers must report to the United States attorney, and the Attorney General must 'immediately' and 'forthwith' bring a forfeiture action if he believes that one is warranted." Id., at 1379 (citations omitted). The Court of Appeals ruled that failure to comply with these internal reporting rules could require dismissal of the forfeiture action as untimely. The court remanded the case for a determination whether the Government had satisfied its obligation to make prompt reports. Id., at 1382.
 
 
 16
 We granted certiorari, 507 U.S. 983 (1993), to resolve a conflict among the Courts of Appeals on the constitutional question presented. Compare United States v. Premises and Real Property at 4492 South Livonia Road, 889 F.2d 1258 (CA2 1989), with United States v. A Single Family Residence and Real Property, 803 F.2d 625 (CA11 1986). We now affirm the due process ruling and reverse the ruling on the timeliness question.
 
 II
 
 17
 The Due Process Clause of the Fifth Amendment guarantees that "no person shall . . . be deprived of life, liberty, or property, without due process of law." Our precedents establish the general rule that individuals must receive notice and an opportunity to be heard before the Government deprives them of property. See United States v. $ 8,850, 461 U.S. 555, 562, n.12, 103 S. Ct. 2005, 76 L. Ed. 2d 143 (1983); Fuentes v. Shevin, 407 U.S. 67, 82, 32 L. Ed. 2d 556, 92 S. Ct. 1983 (1972); Sniadach v. Family Finance Corp. of Bay View, [49] 395 U.S. 337, 342, 23 L. Ed. 2d 349, 89 S. Ct. 1820 (1969) (Harlan, J., concurring); Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313, 94 L. Ed. 865, 70 S. Ct. 652 (1950).
 
 
 18
 The Government does not, and could not, dispute that the seizure of Good's home and 4-acre parcel deprived him of property interests protected by the Due Process Clause. By the Government's own submission, the seizure gave it the right to charge rent, to condition occupancy, and even to evict the occupants. Instead, the Government argues that it afforded Good all the process the Constitution requires. The Government makes two separate points in this regard. First, it contends that compliance with the Fourth Amendment suffices when the Government seizes property for purposes of forfeiture. In the alternative, it argues that the seizure of real property under the drug forfeiture laws justifies an exception to the usual due process requirement of preseizure [499] notice and hearing. We turn to these issues.
 
 
 19
 * The Government argues that because civil forfeiture serves a "law enforcement purpose," Brief for United States 13, the Government need comply only with the Fourth Amendment when seizing forfeitable property. We disagree. The Fourth Amendment does place restrictions on seizures conducted for purposes of civil forfeiture, One 1958 Plymouth Sedan v. Pennsylvania, 380 U.S. 693, 696, 14 L. Ed. 2d 170, 85 S. Ct. 1246 (1965) (holding that the exclusionary rule applies to civil forfeiture), but it does not follow that the Fourth Amendment is the sole constitutional provision in question when the Government seizes property subject to forfeiture.
 
 
 20
 We have rejected the view that the applicability of one constitutional amendment pre-empts the guarantees of another. As explained in Soldal v. Cook County, 506 U.S. 56, 70, 121 L. Ed. 2d 450, 113 S. Ct. 538 (1992):
 
 
 21
 "Certain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands. Where such multiple violations [50] are alleged, we are not in the habit of identifying as a preliminary matter the claim's 'dominant' character. Rather, we examine each constitutional provision in turn."
 
 
 22
 Here, as in Soldal, the seizure of property implicates two "'explicit textual source [s] of constitutional protection,'" the Fourth Amendment and the Fifth. Ibid. The proper question is not which Amendment controls but whether either Amendment is violated.
 
 
 23
 Nevertheless, the Government asserts that when property is seized for forfeiture, the Fourth Amendment provides the full measure of process due under the Fifth. The Government relies on Gerstein v. Pugh, 420 U.S. 103, 43 L. Ed. 2d 54, 95 S. Ct. 854 (1975), and Graham v. Connor, 490 U.S. 386, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989), in support of this proposition. That reliance is misplaced. Gerstein and Graham concerned not the seizure of property but the arrest or detention of criminal suspects, subjects we have considered to be governed by the provisions of the Fourth Amendment without reference to other constitutional guarantees. In addition, also unlike the seizure presented by this case, the arrest or detention of a suspect occurs as part of the regular criminal process, where other safeguards ordinarily ensure compliance with due process.
 
 
 24
 Gerstein held that the Fourth Amendment, rather than the Due Process Clause, determines the requisite postarrest proceedings when individuals are detained on criminal charges. Exclusive reliance on the Fourth Amendment is appropriate in the arrest context, we explained, because the Amendment was "tailored explicitly for the criminal justice system," and its "balance between individual and public interests always has been thought to define the 'process that is due' for seizures of person or property in criminal cases." 420 U.S. at 125, n.27. Furthermore, we noted that the protections afforded during an arrest and initial detention are "only the first stage of an elaborate system, unique in jurisprudence, [51] designed to safeguard the rights of those accused of criminal conduct." Ibid. (emphasis in original).
 
 
 25
 So too, in Graham we held that claims of excessive force in the course of an arrest or investigatory stop should be evaluated under the Fourth Amendment reasonableness standard, not under the "more generalized notion of 'substantive due process.'" 490 U.S. at 395. Because the degree of force used to effect a seizure is one determinant of its reasonableness, and because the Fourth Amendment guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures," we held that a claim of excessive force in the course of such a seizure is "most properly characterized as one invoking the protections of the Fourth Amendment." Id., at 394.
 
 
 26
 Neither Gerstein nor Graham, however, provides support for the proposition that the [500] Fourth Amendment is the beginning and end of the constitutional inquiry whenever a seizure occurs. That proposition is inconsistent with the approach we took in Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 40 L. Ed. 2d 452, 94 S. Ct. 2080 (1974), which examined the constitutionality of ex parte seizures of forfeitable property under general principles of due process, rather than the Fourth Amendment. And it is at odds with our reliance on the Due Process Clause to analyze prejudgment seizure and sequestration of personal property. See, e.g., Fuentes v. Shevin, 407 U.S. 67, 32 L. Ed. 2d 556, 92 S. Ct. 1983 (1972); Mitchell v. W. T. Grant Co., 416 U.S. 600, 40 L. Ed. 2d 406, 94 S. Ct. 1895 (1974).
 
 
 27
 It is true, of course, that the Fourth Amendment applies to searches and seizures in the civil context and may serve to resolve the legality of these governmental actions without reference to other constitutional provisions. See Camara v. Municipal Court of City and County of San Francisco, 387 U.S. 523, 18 L. Ed. 2d 930, 87 S. Ct. 1727 (1967) (holding that a warrant based on probable cause is required for administrative search of residences for safety inspections); Skinner v. Railway Labor Executives' Assn., 489 U.S. 602, 103 L. Ed. 2d 639, 109 S. Ct. 1402 (1989) (holding that federal regulations authorizing railroads to conduct blood and urine tests of certain [52] employees, without a warrant and without reasonable suspicion, do not violate the Fourth Amendment prohibition against unreasonable searches and seizures). But the purpose and effect of the Government's action in the present case go beyond the traditional meaning of search or seizure. Here the Government seized property not to preserve evidence of wrongdoing, but to assert ownership and control over the property itself. Our cases establish that government action of this consequence must comply with the Due Process Clauses of the Fifth and Fourteenth Amendments.
 
 
 28
 Though the Fourth Amendment places limits on the Government's power to seize property for purposes of forfeiture, it does not provide the sole measure of constitutional protection that must be afforded property owners in forfeiture proceedings. So even assuming that the Fourth Amendment were satisfied in this case, it remains for us to determine whether the seizure complied with our well-settled jurisprudence under the Due Process Clause.
 
 B
 
 29
 Whether ex parte seizures of forfeitable property satisfy the Due Process Clause is a question we last confronted in Calero-Toledo v. Pearson Yacht Leasing Co., supra, which held that the Government could seize a yacht subject to civil forfeiture without affording prior notice or hearing. Central to our analysis in Calero-Toledo was the fact that a yacht was the "sort [of property] that could be removed to another jurisdiction, destroyed, or concealed, if advance warning of confiscation were given." Id., at 679. The ease with which an owner could frustrate the Government's interests in the forfeitable property created a "'special need for very prompt action'" that justified the postponement of notice and hearing until after the seizure. Id., at 678 (quoting Fuentes, supra, at 91).
 
 
 30
 We had no occasion in Calero-Toledo to decide whether the same considerations apply to the forfeiture of real property, [53] which, by its very nature, can be neither moved nor concealed. In fact, when Calero-Toledo was decided, both the Puerto Rican statute, P. R. Laws Ann., Tit. 24, § 2512 (Supp. 1973), and the federal forfeiture statute upon which it was modeled, 21 U. S. C. § 881 (1970 ed.), authorized the forfeiture of personal property only. It was not until 1984, 10 years later, that Congress amended § 881 to authorize the forfeiture of real property. See 21 U. S. C. § 881(a)(7); Pub. L. 98-473, § 306, 98 Stat. 2050.
 
 
 31
 The right to prior notice and a hearing is central to the Constitution's command of due process. "The purpose of this requirement is not only to ensure abstract fair [501] play to the individual. Its purpose, more particularly, is to protect his use and possession of property from arbitrary encroachment -- to minimize substantively unfair or mistaken deprivations of property . . . ." Fuentes, 407 U.S. at 80-81.
 
 
 32
 We tolerate some exceptions to the general rule requiring predeprivation notice and hearing, but only in "'extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.'" Id., at 82 (quoting Boddie v. Connecticut, 401 U.S. 371, 379, 28 L. Ed. 2d 113, 91 S. Ct. 780 (1971)); United States v. $ 8,850, 461 U.S. at 562, n.12. Whether the seizure of real property for purposes of civil forfeiture justifies such an exception requires an examination of the competing interests at stake, along with the promptness and adequacy of later proceedings. The three-part inquiry set forth in Mathews v. Eldridge, 424 U.S. 319, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976), provides guidance in this regard. The Mathews analysis requires us to consider the private interest affected by the official action; the risk of an erroneous deprivation of that interest through the procedures used, as well as the probable value of additional safeguards; and the Government's interest, including the administrative burden that additional procedural requirements would impose. Id., at 335.
 
 
 33
 Good's right to maintain control over his home, and to be free from governmental interference, is a private interest of [54] historic and continuing importance. Cf. United States v. Karo, 468 U.S. 705, 714-715, 82 L. Ed. 2d 530, 104 S. Ct. 3296 (1984); Payton v. New York, 445 U.S. 573, 590, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980). The seizure deprived Good of valuable rights of ownership, including the right of sale, the right of occupancy, the right to unrestricted use and enjoyment, and the right to receive rents. All that the seizure left him, by the Government's own submission, was the right to bring a claim for the return of title at some unscheduled future hearing.
 
 
 34
 In Fuentes, we held that the loss of kitchen appliances and household furniture was significant enough to warrant a predeprivation hearing. 407 U.S. at 70-71. And in Connecticut v. Doehr, 501 U.S. 1, 115 L. Ed. 2d 1, 111 S. Ct. 2105 (1991), we held that a state statute authorizing prejudgment attachment of real estate without prior notice or hearing was unconstitutional, in the absence of extraordinary circumstances, even though the attachment did not interfere with the owner's use or possession and did not affect, as a general matter, rentals from existing leaseholds.
 
 
 35
 The seizure of a home produces a far greater deprivation than the loss of furniture, or even attachment. It gives the Government not only the right to prohibit sale, but also the right to evict occupants, to modify the property, to condition occupancy, to receive rents, and to supersede the owner in all rights pertaining to the use, possession, and enjoyment of the property.
 
 
 36
 The Government makes much of the fact that Good was renting his home to tenants, and contends that the tangible effect of the seizure was limited to taking the $ 900 a month he was due in rent. But even if this were the only deprivation at issue, it would not render the loss insignificant or unworthy of due process protection. The rent represents a significant portion of the exploitable economic value of Good's home. It cannot be classified as de minimis for purposes of procedural due process. In sum, the private [55] interests at stake in the seizure of real property weigh heavily in the Mathews balance.
 
 
 37
 The practice of ex parte seizure, moreover, creates an unacceptable risk of error. Although Congress designed the drug forfeiture statute to be a powerful instrument in enforcement of the drug laws, it did not intend to deprive innocent owners of their property. The affirmative defense of innocent ownership is allowed by statute. See 21 U. S. C. § 881(a)(7) ("No property shall be forfeited under this paragraph, to the extent [502] of an interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner").
 
 
 38
 The ex parte preseizure proceeding affords little or no protection to the innocent owner. In issuing a warrant of seizure, the magistrate judge need determine only that there is probable cause to believe that the real property was "used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of," a felony narcotics offense. Ibid. The Government is not required to offer any evidence on the question of innocent ownership or other potential defenses a claimant might have. See, e.g., Austin v. United States, 509 U.S. 602, 125 L. Ed. 2d 488, 113 S. Ct. 2801 (1993) (holding that forfeitures under 21 U. S. C. §§ 881(a)(4) and (a)(7) are subject to the limitations of the Excessive Fines Clause). Nor would that inquiry, in the ex parte stage, suffice to protect the innocent owner's interests. "Fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights. . . . No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it." Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 170-172, 95 L. Ed. 817, 71 S. Ct. 624 (1951) (Frankfurter, J., concurring) (footnotes omitted).
 
 
 39
 The purpose of an adversary hearing is to ensure the requisite neutrality that must inform all governmental decision-making. That protection is of particular importance here, [56] where the Government has a direct pecuniary interest in the outcome of the proceeding. n2 See Harmelin v. Michigan, 501 U.S. 957, 979, n.9, 115 L. Ed. 2d 836, 111 S. Ct. 2680 (1991) (opinion of SCALIA, J.) ("It makes sense to scrutinize governmental action more closely when the State stands to benefit"). Moreover, the availability of a postseizure hearing may be no recompense for losses caused by erroneous seizure. Given the congested civil dockets in federal courts, a claimant may not receive an adversary hearing until many months after the seizure. And even if the ultimate judicial decision is that the claimant was an innocent owner, or that the Government lacked probable cause, this determination, coming months after the seizure, "would not cure the temporary deprivation that an earlier hearing might have prevented." Doehr, 501 U.S. at 15.
 
 
 40
 - - - - - - - - - - - - - - Footnotes - - - - - - - - - -
 
 
 41
 n2 The extent of the Government's financial stake in drug forfeiture is apparent from a 1990 memo, in which the Attorney General urged United States Attorneys to increase the volume of forfeitures in order to meet the Department of Justice's annual budget target:
 
 
 42
 "We must significantly increase production to reach our budget target.
 
 
 43
 ". . . Failure to achieve the $ 470 million projection would expose the Department's forfeiture program to criticism and undermine confidence in our budget projections. Every effort must be made to increase forfeiture income during the remaining three months of [fiscal year] 1990." Executive Office for United States Attorneys, U. S. Dept. of Justice, 38 United States Attorney's Bulletin 180 (1990).
 
 
 44
 - - - - - - - - - - - - End Footnotes- - - - - - - - -
 
 
 45
 This brings us to the third consideration under Mathews, "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335. The governmental interest we consider here is not some general interest in forfeiting property but the specific interest in seizing real property before the forfeiture hearing. The question in the civil forfeiture context is whether ex parte seizure is justified by a pressing need for prompt action. See Fuentes, 407 U.S. at 91. We find no pressing need here.
 
 
 46
 [57] This is apparent by comparison to Calero-Toledo, where the Government's interest in immediate seizure of a yacht subject to civil forfeiture justified dispensing with the usual requirement of prior notice and hearing. Two essential considerations informed our ruling in that case: First, immediate seizure was necessary to establish the court's jurisdiction over the property, 416 U.S. at 679, and second, the yacht might have disappeared had the [503] Government given advance warning of the forfeiture action, ibid. See also United States v. Von Neumann, 474 U.S. 242, 251, 88 L. Ed. 2d 587, 106 S. Ct. 610 (1986) (no preseizure hearing is required when customs officials seize an automobile at the border). Neither of these factors is present when the target of forfeiture is real property.
 
 
 47
 Because real property cannot abscond, the court's jurisdiction can be preserved without prior seizure. It is true that seizure of the res has long been considered a prerequisite to the initiation of in rem forfeiture proceedings. See Republic Nat. Bank of Miami v. United States, 506 U.S. 80, 84, 121 L. Ed. 2d 474, 113 S. Ct. 554 (1992); United States v. One Assortment of 89 Firearms, 465 U.S. 354, 363 (1984). This rule had its origins in the Court's early admiralty cases, which involved the forfeiture of vessels and other movable personal property. See Taylor v. Carryl, 61 U.S. 583, 20 How. 583, 599, 15 L. Ed. 1028 (1858); The Brig Ann, 13 U.S. 289, 9 Cranch 289, 3 L. Ed. 734 (1815); Keene v. United States, 9 U.S. 304, 5 Cranch 304, 310, 3 L. Ed. 108 (1809). Justice Story, writing for the Court in The Brig Ann, explained the justification for the rule as one of fixing and preserving jurisdiction: "Before judicial cognizance can attach upon a forfeiture in rem, . . . there must be a seizure; for until seizure it is impossible to ascertain what is the competent forum." 9 Cranch, at 291. But when the res is real property, rather than personal goods, the appropriate judicial forum may be determined without actual seizure.
 
 
 48
 As The Brig Ann held, all that is necessary "in order to institute and perfect proceedings in rem, [is] that the thing should be actually or constructively within the reach of the Court." Ibid. And as we noted last Term, "fairly read, [58] The Brig Ann simply restates the rule that the court must have actual or constructive control of the res when an in rem forfeiture suit is initiated." Republic Nat. Bank, supra, at 87. In the case of real property, the res may be brought within the reach of the court simply by posting notice on the property and leaving a copy of the process with the occupant. In fact, the rules which govern forfeiture proceedings under § 881 already permit process to be executed on real property without physical seizure:
 
 
 49
 "If the character or situation of the property is such that the taking of actual possession is impracticable, the marshal or other person executing the process shall affix a copy thereof to the property in a conspicuous place and leave a copy of the complaint and process with the person having possession or the person's agent." Rule E(4)(b), Supplemental Rules for Certain Admiralty and Maritime Claims.
 
 
 50
 See also United States v. TWP 17 R 4, Certain Real Property in Maine, 970 F.2d 984, 986, and n.4 (CA1 1992).
 
 
 51
 Nor is the ex parte seizure of real property necessary to accomplish the statutory purpose of § 881(a)(7). The Government's legitimate interests at the inception of forfeiture proceedings are to ensure that the property not be sold, destroyed, or used for further illegal activity prior to the forfeiture judgment. These legitimate interests can be secured without seizing the subject property.
 
 
 52
 Sale of the property can be prevented by filing a notice of lis pendens as authorized by state law when the forfeiture proceedings commence. 28 U. S. C. § 1964; and see Haw. Rev. Stat. § 634-51 (1985) (lis pendens provision). If there is evidence, in a particular case, that an owner is likely to destroy his property when advised of the pending action, the Government may obtain an ex parte restraining order, or other appropriate relief, upon a proper showing in district court. See Fed. Rule Civ. Proc. 65; United States v. Premises [59] and Real Property at 4492 South Livonia Road, 889 F.2d 1258, 1265 (CA2 1989). The Government's policy of leaving occupants in possession of real property under an occupancy agreement pending the final forfeiture ruling demonstrates that there is no serious concern about destruction in the ordinary case. See Brief for United States 13, n.6 (citing Directive No. 90-10 [504] (Oct. 9, 1990), Executive Office for Asset Forfeiture, Office of Deputy Attorney General). Finally, the Government can forestall further illegal activity with search and arrest warrants obtained in the ordinary course.
 
 
 53
 In the usual case, the Government thus has various means, short of seizure, to protect its legitimate interests in forfeitable real property. There is no reason to take the additional step of asserting control over the property without first affording notice and an adversary hearing.
 
 
 54
 Requiring the Government to postpone seizure until after an adversary hearing creates no significant administrative burden. A claimant is already entitled to an adversary hearing before a final judgment of forfeiture. No extra hearing would be required in the typical case, since the Government can wait until after the forfeiture judgment to seize the property. From an administrative standpoint it makes little difference whether that hearing is held before or after the seizure. And any harm that results from delay is minimal in comparison to the injury occasioned by erroneous seizure.
 
 C
 
 55
 It is true that, in cases decided over a century ago, we permitted the ex parte seizure of real property when the Government was collecting debts or revenue. See, e.g., Springer v. United States, 102 U.S. 586, 593-594, 26 L. Ed. 253 (1881); Murray's Lessee v. Hoboken Land & Improvement Co., 59 U.S. 272, 18 How. 272, 15 L. Ed. 372 (1856). Without revisiting these cases, it suffices to say that their apparent rationale -- like that for allowing summary seizures during wartime, see Stoehr v. Wallace, 255 U.S. 239, 65 L. Ed. 604, 41 S. Ct. 293 [60] (1921); Bowles v. Willingham, 321 U.S. 503, 88 L. Ed. 892, 64 S. Ct. 641 (1944), and seizures of contaminated food, see North American Cold Storage Co. v. Chicago, 211 U.S. 306, 53 L. Ed. 195, 29 S. Ct. 101 (1908) -- was one of executive urgency. "The prompt payment of taxes," we noted, "may be vital to the existence of a government." Springer, supra, at 594. See also G. M. Leasing Corp. v. United States, 429 U.S. 338, 352, n.18, 50 L. Ed. 2d 530, 97 S. Ct. 619 (1977) ("The rationale underlying [the revenue] decisions, of course, is that the very existence of government depends upon the prompt collection of the revenues").
 
 
 56
 A like rationale justified the ex parte seizure of tax-delinquent distilleries in the late 19th century, see, e.g., United States v. Stowell, 133 U.S. 1, 33 L. Ed. 555, 10 S. Ct. 244 (1890); Dobbins's Distillery v. United States, 96 U.S. 395, 24 L. Ed. 637 (1878), since before passage of the Sixteenth Amendment, the Federal Government relied heavily on liquor, customs, and tobacco taxes to generate operating revenues. In 1902, for example, nearly 75 percent of total federal revenues -- $ 479 million out of a total of $ 653 million -- was raised from taxes on liquor, customs, and tobacco. See U. S. Bureau of Census, Historical Statistics of the United States, Colonial Times to the Present 1122 (1976).
 
 
 57
 The federal income tax code adopted in the first quarter of this century, however, afforded the taxpayer notice and an opportunity to be heard by the Board of Tax Appeals before the Government could seize property for nonpayment of taxes. See Revenue Act of 1921, 42 Stat. 265-266; Revenue Act of 1924, 43 Stat. 297. In Phillips v. Commissioner, 283 U.S. 589, 75 L. Ed. 1289, 51 S. Ct. 608 (1931), the Court relied upon the availability, and adequacy, of these preseizure administrative procedures in holding that no judicial hearing was required prior to the seizure of property. Id., at 597-599 (citing Act of Feb. 26, 1926, ch. 27, § 274(a), 44 Stat. 9, 55; Act of May 29, 1928, ch. 852, §§ 272(a), 601, 45 Stat. 791, 852, 872). These constraints on the Commissioner could be overridden, but only when the Commissioner made a determination that a jeopardy assessment was necessary. 283 U.S. at 598. Writing for a unanimous [61] Court, Justice Brandeis explained that under the tax laws "formal notice of the tax liability is thus given; the Commissioner is required to answer; and there is a complete hearing de novo . . . . These provisions amply protect the [taxpayer] against improper [505] administrative action." Id., at 598-599; see also Commissioner v. Shapiro, 424 U.S. 614, 631, 47 L. Ed. 2d 278, 96 S. Ct. 1062 (1976) ("[In] the Phillips case . . . the taxpayer's assets could not have been taken or frozen . . . until he had either had, or waived his right to, a full and final adjudication of his tax liability before the Tax Court (then the Board of Tax Appeals)").
 
 
 58
 Similar provisions remain in force today. The current Internal Revenue Code prohibits the Government from levying upon a deficient taxpayer's property without first affording the taxpayer notice and an opportunity for a hearing, unless exigent circumstances indicate that delay will jeopardize the collection of taxes due. See 26 U. S. C. §§ 6212, 6213, 6851, 6861.
 
 
 59
 Just as the urgencies that justified summary seizure of property in the 19th century had dissipated by the time of Phillips, neither is there a plausible claim of urgency today to justify the summary seizure of real property under § 881(a)(7). Although the Government relies to some extent on forfeitures as a means of defraying law enforcement expenses, it does not, and we think could not, justify the prehearing seizure of forfeitable real property as necessary for the protection of its revenues.
 
 D
 
 60
 The constitutional limitations we enforce in this case apply to real property in general, not simply to residences. That said, the case before us well illustrates an essential principle: Individual freedom finds tangible expression in property rights. At stake in this and many other forfeiture cases are the security and privacy of the home and those who take shelter within it.
 
 
 61
 [62]
 
 
 62
 Finally, the suggestion that this one claimant must lose because his conviction was known at the time of seizure, and because he raises an as applied challenge to the statute, founders on a bedrock proposition: Fair procedures are not confined to the innocent. The question before us is the legality of the seizure, not the strength of the Government's case.
 
 
 63
 In sum, based upon the importance of the private interests at risk and the absence of countervailing Government needs, we hold that the seizure of real property under § 881(a)(7) is not one of those extraordinary instances that justify the postponement of notice and hearing. Unless exigent circumstances are present, the Due Process Clause requires the Government to afford notice and a meaningful opportunity to be heard before seizing real property subject to civil forfeiture. n3
 
 
 64
 - - - - - - - - - - - - - - Footnotes - - - - - - - - - -
 
 
 65
 n3 We do not address what sort of procedures are required for preforfeiture seizures of real property in the context of criminal forfeiture. See, e.g., 21 U. S. C. § 853; 18 U. S. C. § 1963 (1988 ed. and Supp. IV). We note, however, that the federal drug laws now permit seizure before entry of a criminal forfeiture judgment only where the Government persuades a district court that there is probable cause to believe that a protective order "may not be sufficient to assure the availability of the property for forfeiture." 21 U. S. C. § 853(f).
 
 
 66
 - - - - - - - - - - - - End Footnotes- - - - - - - - -
 
 
 67
 To establish exigent circumstances, the Government must show that less restrictive measures -- i.e., a lis pendens, restraining order, or bond -- would not suffice to protect the Government's interests in preventing the sale, destruction, or continued unlawful use of the real property. We agree with the Court of Appeals that no showing of exigent circumstances has been made in this case, and we affirm its ruling that the ex parte seizure of Good's real property violated due process.
 
 III
 
 68
 We turn now to the question whether a court must dismiss a forfeiture action that the Government filed within the statute [63] of limitations, but without complying with certain other statutory timing directives.
 
 
 69
 Title 21 U. S. C. § 881(d) incorporates the "provisions of law relating to the seizure, summary and judicial forfeiture, and condemnation of property for violation of the customs laws." The customs laws in turn set forth various timing requirements. Title 19 U. S. C. § [506] 1621 contains the statute of limitations: "No suit or action to recover any pecuniary penalty or forfeiture of property accruing under the customs laws shall be instituted unless such suit or action is commenced within five years after the time when the alleged offense was discovered." All agree that the Government filed its action within the statutory period.
 
 
 70
 The customs laws also contain a series of internal requirements relating to the timing of forfeitures. Title 19 U. S. C. § 1602 requires that a customs agent "report immediately" to a customs officer every seizure for violation of the customs laws, and every violation of the customs laws. Section 1603 requires that the customs officer "report promptly" such seizures or violations to the United States attorney. And § 1604 requires the Attorney General "forthwith to cause the proper proceedings to be commenced" if it appears probable that any fine, penalty, or forfeiture has been incurred. The Court of Appeals held, over a dissent, that failure to comply with these internal timing requirements mandates dismissal of the forfeiture action. We disagree.
 
 
 71
 We have long recognized that "many statutory requisitions intended for the guide of officers in the conduct of business devolved upon them . . . do not limit their power or render its exercise in disregard of the requisitions ineffectual." French v. Edwards, 80 U.S. 506, 13 Wall. 506, 511, 20 L. Ed. 702 (1872). We have held that if a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction. See United States v. Montalvo-Murillo, 495 U.S. 711, 717-721, 109 L. Ed. 2d 720, 110 S. Ct. 2072 (1990); Brock v. Pierce County, 476 U.S. 253, 259-262, 90 L. Ed. 2d 248, 106 S. Ct. 1834 [64] (1986); see also St. Regis Mohawk Tribe v. Brock, 769 F.2d 37, 41 (CA2 1985) (Friendly, J.).
 
 
 72
 In Montalvo-Murillo, for example, we considered the Bail Reform Act of 1984, which requires an "immediate" hearing upon a pretrial detainee's "first appearance before the judicial officer." 18 U. S. C. § 3142(f). Because "neither the timing requirements nor any other part of the Act [could] be read to require, or even suggest, that a timing error must result in release of a person who should otherwise be detained," we held that the federal courts could not release a person pending trial solely because the hearing had not been held "immediately." 495 U.S. at 716-717. We stated that "there is no presumption or general rule that for every duty imposed upon the court or the Government and its prosecutors there must exist some corollary punitive sanction for departures or omissions, even if negligent." Id., at 717 (citing French, supra, at 511). To the contrary, we stated that "we do not agree that we should, or can, invent a remedy to satisfy some perceived need to coerce the courts and the Government into complying with the statutory time limits." 495 U.S. at 721.
 
 
 73
 Similarly, in Brock, supra, we considered a statute requiring that the Secretary of Labor begin an investigation within 120 days of receiving information about the misuse of federal funds. The respondent there argued that failure to act within the specified time period divested the Secretary of authority to investigate a claim after the time limit had passed. We rejected that contention, relying on the fact that the statute did not specify a consequence for a failure to comply with the timing provision. 476 U.S. at 258-262.
 
 
 74
 Under our precedents, the failure of Congress to specify a consequence for noncompliance with the timing requirements of 19 U. S. C. §§ 1602-1604 implies that Congress intended the responsible officials administering the Act to have discretion to determine what disciplinary measures are appropriate when their subordinates fail to discharge their statutory [65] duties. Examination of the structure and history of the internal timing provisions at issue in this case supports the conclusion that the courts [507] should not dismiss a forfeiture action for noncompliance. Because § 1621 contains a statute of limitations -- the usual legal protection against stale claims -- we doubt Congress intended to require dismissal of a forfeiture action for noncompliance with the internal timing requirements of §§ 1602-1604. Cf. United States v. $ 8,850, 461 U.S. at 563, n.13.
 
 
 75
 Statutes requiring customs officials to proceed with dispatch have existed at least since 1799. See Act of Mar. 2, 1799, § 89, 1 Stat. 695-696. These directives help to ensure that the Government is prompt in obtaining revenue from forfeited property. It would make little sense to interpret directives designed to ensure the expeditious collection of revenues in a way that renders the Government unable, in certain circumstances, to obtain its revenues at all.
 
 
 76
 We hold that courts may not dismiss a forfeiture action filed within the 5-year statute of limitations for noncompliance with the internal timing requirements of §§ 1602-1604. The Government filed the action in this case within the 5-year statute of limitations, and that sufficed to make it timely. We reverse the contrary holding of the Court of Appeals.
 
 IV
 
 77
 The case is remanded for further proceedings consistent with this opinion.
 
 
 78
 It is so ordered.
 
 
 79
 CONCUR BY: REHNQUIST (In Part); O'CONNOR (In Part); THOMAS (In Part)
 
 
 80
 DISSENT BY: REHNQUIST (In Part); O'CONNOR (In Part); THOMAS (In Part)
 
 
 81
 DISSENT: CHIEF JUSTICE REHNQUIST, with whom JUSTICE SCALIA joins, and with whom JUSTICE O'CONNOR joins as to Parts II and III, concurring in part and dissenting in part.
 
 
 82
 I concur in Parts I and III of the Court's opinion and dissent with respect to Part II. The Court today departs from longstanding historical precedent and concludes that the ex parte warrant requirement under the Fourth Amendment [66] fails to afford adequate due process protection to property owners who have been convicted of a crime that renders their real property susceptible to civil forfeiture under 21 U. S. C. § 881(a)(7). It reaches this conclusion although no such adversary hearing is required to deprive a criminal defendant of his liberty before trial. And its reasoning casts doubt upon long settled law relating to seizure of property to enforce income tax liability. I dissent from this ill-considered and disruptive decision.
 
 
 83
 * The Court applies the three-factor balancing test for evaluating procedural due process claims set out in Mathews v. Eldridge, 424 U.S. 319, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976), to reach its unprecedented holding. I reject the majority's expansive application of Mathews. Mathews involved a due process challenge to the adequacy of administrative procedures established for the purpose of terminating Social Security disability benefits, and the Mathews balancing test was first conceived to address due process claims arising in the context of modern administrative law. No historical practices existed in this context for the Court to consider. The Court has expressly rejected the notion that the Mathews balancing test constitutes a "one-size-fits-all" formula for deciding every due process claim that comes before the Court. See Medina v. California, 505 U.S. 437, 120 L. Ed. 2d 353, 112 S. Ct. 2572 (1992) (holding that the Due Process Clause has limited operation beyond the specific guarantees enumerated in the Bill of Rights). More importantly, the Court does not work on a clean slate in the civil forfeiture context involved here. It has long sanctioned summary proceedings in civil forfeitures. See, e.g., Dobbins's Distillery v. United States, 96 U.S. 395, 24 L. Ed. 637 (1878) (upholding seizure of a distillery by executive officers based on ex parte warrant); and G. M. Leasing Corp. v. United States, 429 U.S. 338, 50 L. Ed. 2d 530, 97 S. Ct. 619 (1977) (upholding warrantless automobile seizures).
 
 
 84
 [67] A
 
 
 85
 The Court's fixation on Mathews sharply conflicts with both historical practice and the specific textual source of the Fourth Amendment's " [508] reasonableness" inquiry. The Fourth Amendment strikes a balance between the people's security in their persons, houses, papers, and effects and the public interest in effecting searches and seizures for law enforcement purposes. Zurcher v. Stanford Daily, 436 U.S. 547, 559, 56 L. Ed. 2d 525, 98 S. Ct. 1970 (1978); see also Maryland v. Buie, 494 U.S. 325, 331, 108 L. Ed. 2d 276, 110 S. Ct. 1093 (1990); and Skinner v. Railway Labor Executives' Assn., 489 U.S. 602, 619, 103 L. Ed. 2d 639, 109 S. Ct. 1402 (1989). Compliance with the standards and procedures prescribed by the Fourth Amendment constitutes all the "process" that is "due" to respondent Good under the Fifth Amendment in the forfeiture context. We made this very point in Gerstein v. Pugh, 420 U.S. 103, 43 L. Ed. 2d 54, 95 S. Ct. 854 (1975), with respect to procedures for detaining a criminal defendant pending trial:
 
 
 86
 "The historical basis of the probable cause requirement is quite different from the relatively recent application of variable procedural due process in debtor-creditor disputes and termination of government-created benefits. The Fourth Amendment was tailored explicitly for the criminal justice system, and its balance between individual and public interests always has been thought to define the 'process that is due' for seizures of person or property in criminal cases, including the detention of suspects pending trial." Id., at 125, n.27 (emphasis added).
 
 
 87
 The Gerstein Court went on to decide that while there must be a determination of probable cause by a neutral magistrate in order to detain an arrested suspect prior to trial, such a determination could be made in a nonadversarial proceeding, based on hearsay and written testimony. Id., at 120. It is paradoxical indeed to hold that a criminal defendant can be temporarily deprived of liberty on the basis of an ex parte [68] probable-cause determination, yet respondent Good cannot be temporarily deprived of property on the same basis. As we said in United States v. Monsanto, 491 U.S. 600, 615-616, 105 L. Ed. 2d 512, 109 S. Ct. 2657 (1989):
 
 
 88
 "It would be odd to conclude that the Government may not restrain property, such as the home and apartment in respondent's possession, based on a finding of probable cause, when we have held that (under appropriate circumstances), the Government may restrain persons where there is a finding of probable cause to believe that the accused has committed a serious offense."
 
 
 89
 Similarly, in Graham v. Connor, 490 U.S. 386, 394-395, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989), the Court faced the question of what constitutional standard governs a free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other "seizure" of his person. We held that the Fourth Amendment, rather than the Due Process Clause, provides the source of any specific limitations on the use of force in seizing a person: "Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process' must be the guide for analyzing these claims." Id., at 395. The "explicit textual source of constitutional protection" found in the Fourth Amendment should also guide the analysis of respondent Good's claim of a right to additional procedural measures in civil forfeitures.
 
 B
 
 90
 The Court dismisses the holdings of Gerstein and Graham as inapposite because they concern "the arrest or detention of criminal suspects." Ante, at 50. But we have never held that the Fourth Amendment is limited only to criminal proceedings. In Soldal v. Cook County, 506 U.S. 56, 67, 121 L. Ed. 2d 450, 113 S. Ct. 538 (1992), [69] we expressly stated that the Fourth Amendment "applies in the civil context as well." Our historical treatment of civil forfeiture procedures underscores the notion that the Fourth [509] Amendment specifically governs the process afforded in the civil forfeiture context, and it is too late in the day to question its exclusive application. As we decided in Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 40 L. Ed. 2d 452, 94 S. Ct. 2080 (1974), there is no need to look beyond the Fourth Amendment in civil forfeiture proceedings involving the Government because ex parte seizures are "'too firmly fixed in the punitive and remedial jurisprudence of the country to be now displaced.'" Id., at 686 (quoting J. W. Goldsmith, Jr.-Grant Co. v. United States, 254 U.S. 505, 510-511, 65 L. Ed. 376, 41 S. Ct. 189 (1921) (forfeiture not a denial of procedural due process despite the absence of preseizure notice and opportunity for a hearing)).
 
 
 91
 The Court acknowledges the long history of ex parte seizures of real property through civil forfeiture, see Phillips v. Commissioner, 283 U.S. 589, 75 L. Ed. 1289, 51 S. Ct. 608 (1931); Springer v. United States, 102 U.S. 586, 26 L. Ed. 253 (1881); Murray's Lessee v. Hoboken Land & Improvement Co., 59 U.S. 272, 18 How. 272, 15 L. Ed. 372 (1856); United States v. Stowell, 133 U.S. 1, 33 L. Ed. 555, 10 S. Ct. 244 (1890); and Dobbins's Distillery v. United States, 96 U.S. 395, 24 L. Ed. 637 (1878), and says "without revisiting these cases," ante, at 59 -- whatever that means -- that they appear to depend on the need for prompt payment of taxes. The Court goes on to note that the passage of the Sixteenth Amendment alleviated the Government's reliance on liquor, customs, and tobacco taxes as sources of operating revenue. Whatever the merits of this novel distinction, it fails entirely to distinguish the leading case in the field, Phillips v. Commissioner, supra, a unanimous opinion authored by Justice Brandeis. That case dealt with the enforcement of income tax liability, which the Court says has replaced earlier forms of taxation as the principal source of governmental revenue. There the Court said:
 
 
 92
 "The right of the United States to collect its internal revenue by summary administrative proceedings has [70] long been settled. Where, as here, adequate opportunity is afforded for a later judicial determination of the legal rights, summary proceedings to secure prompt performance of pecuniary obligations to the government have been consistently sustained." 283 U.S. at 595 (footnote omitted).
 
 
 93
 "Where only property rights are involved, mere post-ponement of the judicial enquiry is not a denial of due process, if the opportunity given for the ultimate judicial determination of the liability is adequate." Id., at 596-597.
 
 
 94
 Thus today's decision does not merely discard established precedents regarding excise taxes, but deals at least a glancing blow to the authority of the Government to collect income tax delinquencies by summary proceedings.
 
 II
 
 95
 The Court attempts to justify the result it reaches by expansive readings of Fuentes v. Shevin, 407 U.S. 67, 32 L. Ed. 2d 556, 92 S. Ct. 1983 (1972), and Connecticut v. Doehr, 501 U.S. 1, 115 L. Ed. 2d 1, 111 S. Ct. 2105 (1991). In Fuentes, the Court struck down state replevin procedures, finding that they served no important state interest that might justify the summary proceedings. 407 U.S. at 96. Specifically, the Court noted that the tension between the private buyer's use of the property pending final judgment and the private seller's interest in preventing further use and deterioration of his security tipped the balance in favor of a prior hearing in certain replevin situations. "[The provisions] allow summary seizure of a person's possessions when no more than private gain is directly at stake." Id., at 92. Cf. Mitchell v. W. T. Grant Co., 416 U.S. 600, 40 L. Ed. 2d 406, 94 S. Ct. 1895 (1974) (upholding Louisiana sequestration statute that provided immediate postdeprivation hearing along with the option of damages).
 
 
 96
 The Court in Fuentes also was careful to point out the limited situations in which seizure before hearing was constitutionally permissible, and included among them "summary [71] seizure of property to collect the [510] internal revenue of the United States." 407 U.S. at 91-92 (citing Phillips v. Commissioner, supra). Certainly the present seizure is analogous, and it is therefore quite inaccurate to suggest that Fuentes is authority for the Court's holding in the present case.
 
 
 97
 Likewise in Doehr, the Court struck down a state statute authorizing prejudgment attachment of real estate without prior notice or hearing due to potential bias of the self-interested private party seeking attachment. The Court noted that the statute enables one of the private parties to "'make use of state procedures with the overt, significant assistance of state officials,'" that involve state action "'substantial enough to implicate the Due Process Clause.'" Connecticut v. Doehr, supra, at 11 (quoting Tulsa Professional Collection Services, Inc. v. Pope, 485 U.S. 478, 486, 99 L. Ed. 2d 565, 108 S. Ct. 1340 (1988)). The Court concluded that, absent exigent circumstances, the private party's interest in attaching the property did not justify the burdening of the private property owner's rights without a hearing to determine the likelihood of recovery. 501 U.S. at 18. In the present case, however, it is not a private party but the Government itself which is seizing the property.
 
 
 98
 The Court's effort to distinguish Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 40 L. Ed. 2d 452, 94 S. Ct. 2080 (1974), is similarly unpersuasive. The Court says that "central to our analysis in Calero-Toledo was the fact that a yacht was the 'sort [of property] that could be removed to another jurisdiction, destroyed, or concealed, if advance warning of confiscation were given.'" Ante, at 52 (quoting Calero-Toledo, supra, at 679). But this is one of the three reasons given by the Court for upholding the summary forfeiture in that case: The other two -- "fostering the public interest in preventing continued illicit use of the property," and the fact that the "seizure is not initiated by self-interested private parties; rather, Commonwealth officials determine whether seizure is appropriate . . .," 416 U.S. at 679 -- are both met in the present [72] case. And while not capable of being moved or concealed, the real property at issue here surely could be destroyed or damaged. Several dwellings are located on the property that was seized from respondent Good, and these buildings could easily be destroyed or damaged to prevent them from falling into the hands of the Government if prior notice were required.
 
 
 99
 The government interests found decisive in Calero-Toledo are equally present here: The seizure of respondent Good's real property serves important governmental purposes in combating illegal drugs; a preseizure notice might frustrate this statutory purpose by permitting respondent Good to destroy or otherwise damage the buildings on the property; and Government officials made the seizure rather than self-interested private parties seeking to gain from the seizure. Although the Court has found some owners entitled to an immediate postseizure administrative hearing, see, e.g., Mitchell v. W. T. Grant Co., supra, not until the majority adopted the Court of Appeals ruling have we held that the Constitution demanded notice and a preseizure hearing to satisfy due process requirements in civil forfeiture cases.
 
 
 100
 - - - - - - - - - - - - - - Footnotes - - - - - - - - - -
 
 
 101
 Ironically, courts and commentators have debated whether even a warrant should be required for civil forfeiture seizures, not whether notice and a preseizure hearing should apply. See, e.g., Nelson, Should the Ranch Go Free Because the Constable Blundered? Gaining Compliance with Search and Seizure Standards in the Age of Asset Forfeiture, 80 Calif. L. Rev. 1309 (1992); Ahuja, Civil Forfeiture, Warrantless Property Seizures, and the Fourth Amendment, 5 Yale L. & Policy Rev. 428 (1987); and Comment, Forfeiture, Seizures and the Warrant Requirement, 48 U. Chi. L. Rev. 960 (1981). Forcing the Government to notify the affected property owners and go through a preseizure hearing in civil forfeiture cases must have seemed beyond the pale to these commentators.
 
 
 102
 - - - - - - - - - - - - End Footnotes- - - - - - - - -
 
 III
 
 103
 This is not to say that the Government's use of civil forfeiture statutes to seize real property in drug cases may not cause hardship to innocent individuals. But I have [511] grave [73] doubts whether the Court's decision in this case will do much to alleviate those hardships, and I am confident that whatever social benefits might flow from the decision are more than offset by the damage to settled principles of constitutional law which are inflicted to secure these perceived social benefits. I would reverse the decision of the Court of Appeals in toto.
 
 
 104
 JUSTICE O'CONNOR, concurring in part and dissenting in part.
 
 
 105
 Today the Court declares unconstitutional an act of the Executive Branch taken with the prior approval of a Federal Magistrate Judge in full compliance with the laws enacted by Congress. On the facts of this case, however, I am unable to conclude that the seizure of Good's property did not afford him due process. I agree with the Court's observation in an analogous case more than a century ago: "If the laws here in question involved any wrong or unnecessary harshness, it was for Congress, or the people who make congresses, to see that the evil was corrected. The remedy does not lie with the judicial branch of the government." Springer v. United States, 102 U.S. 586, 594, 26 L. Ed. 253 (1881).
 
 
 106
 * With respect to whether 19 U. S. C. §§ 1602-1604 impose a timeliness requirement over and above the statute of limitations, I agree with the dissenting judge below that the Ninth Circuit improperly "converted a set of housekeeping rules for the government into statutory protection for the property of malefactors." 971 F.2d 1376, 1384 (1992). I therefore join Parts I and III of the Court's opinion.
 
 
 107
 I cannot agree, however, that under the circumstances of this case -- where the property owner was previously convicted of a drug offense involving the property, the Government obtained a warrant before seizing it, and the residents were not dispossessed -- there was a due process violation [74] simply because Good did not receive preseizure notice and an opportunity to be heard. I therefore respectfully dissent from Part II of the Court's opinion; I also join Parts II and III of the opinion of THE CHIEF JUSTICE.
 
 II
 
 108
 My first disagreement is with the Court's holding that the Government must give notice and a hearing before seizing any real property prior to forfeiting it. That conclusion is inconsistent with over a hundred years of our case law. We have already held that seizure for purpose of forfeiture is one of those "extraordinary situations, " Fuentes v. Shevin, 407 U.S. 67, 82, 32 L. Ed. 2d 556, 92 S. Ct. 1983 (1972) (internal quotation marks omitted), in which the Due Process Clause does not require predeprivation notice and an opportunity to be heard. Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 676-680, 40 L. Ed. 2d 452, 94 S. Ct. 2080 (1974). As we have recognized, Calero-Toledo "clearly indicates that due process does not require federal [agents] to conduct a hearing before seizing items subject to forfeiture." United States v. $ 8,850, 461 U.S. 555, 562, n.12, 103 S. Ct. 2005, 76 L. Ed. 2d 143 (1983); see also United States v. Von Neumann, 474 U.S. 242, 249, n.7, 88 L. Ed. 2d 587, 106 S. Ct. 610 (1986). Those cases reflect the commonsense notion that the property owner receives all the process that is due at the forfeiture hearing itself. See id., at 251 ("[The claimant's] right to a [timely] forfeiture proceeding . . . satisfies any due process right with respect to the [forfeited property]"); Windsor v. McVeigh, 93 U.S. 274, 279, 23 L. Ed. 914 (1876).
 
 
 109
 The distinction the Court tries to draw between our precedents and this case -- the only distinction it can draw -- is that real property is somehow different than personal property for due process purposes. But that distinction has never been considered constitutionally relevant in our forfeiture cases. Indeed, this Court rejected precisely the same distinction in a case in which we were presented with a due process challenge to the forfeiture of real property for back taxes:
 
 
 110
 [75] " [512] The power to distrain personal property for the payment of taxes is almost as old as the common law. . . . Why is it not competent for Congress to apply to realty as well as personalty the power to distrain and sell when necessary to enforce the payment of a tax? It is only the further legitimate exercise of the same power for the same purpose." Springer, 102 U.S. at 593-594.
 
 
 111
 There is likewise no basis for distinguishing between real and personal property in the context of forfeiture of property used for criminal purposes. The required nexus between the property and the crime -- that it be used to commit, or facilitate the commission of, a drug offense -- is the same for forfeiture of real and personal property. Compare 21 U. S. C. § 881(a)(4) with § 881(a)(7); see Austin v. United States, 509 U.S. 602, 619-622, 125 L. Ed. 2d 488, 113 S. Ct. 2801 (1993) (construing the two provisions equivalently). Forfeiture of real property under similar circumstances has long been recognized. Dobbins's Distillery v. United States, 96 U.S. 395, 399, 24 L. Ed. 637 (1878) (upholding forfeiture of "the real estate used to facilitate the [illegal] operation of distilling"); see also United States v. Stowell, 133 U.S. 1, 33 L. Ed. 555, 10 S. Ct. 244 (1890) (upholding forfeiture of land and buildings used in connection with illegal brewery).
 
 
 112
 The Court attempts to distinguish our precedents by characterizing them as being based on "executive urgency." Ante, at 60. But this case, like all forfeiture cases, also involves executive urgency. Indeed, the Court in Calero-Toledo relied on the same cases the Court disparages:
 
 
 113
 "Due process is not denied when postponement of notice and hearing is necessary to protect the public from contaminated food, North American [Cold] Storage Co. v. Chicago, 211 U.S. 306, 53 L. Ed. 195, 29 S. Ct. 101 (1908); . . . or to aid the collection of taxes, Phillips v. Commissioner, 283 U.S. 589, 75 L. Ed. 1289, 51 S. Ct. 608 (1931); or the war effort, United States v. Pfitsch, 256 U.S. 547, 65 L. Ed. 1084, 41 S. Ct. 569 (1921)." 416 U.S. at 679.
 
 
 114
 [76] The Court says that there is no "plausible claim of urgency today to justify the summary seizure of real property under § 881(a)(7)." Ante, at 61. But we said precisely the opposite in Calero-Toledo: "The considerations that justified postponement of notice and hearing in those cases are present here." 416 U.S. at 679. The only distinction between this case and Calero-Toledo is that the property forfeited here was realty, whereas the yacht in Calero-Toledo was personalty.
 
 
 115
 It is entirely spurious to say, as the Court does, that executive urgency depends on the nature of the property sought to be forfeited. The Court reaches its anomalous result by mischaracterizing Calero-Toledo, stating that the movability of the yacht there at issue was "central to our analysis." Ante, at 52. What we actually said in Calero-Toledo, however, was that "preseizure notice and hearing might frustrate the interests served by [forfeiture] statutes, since the property seized -- as here, a yacht -- will often be of a sort that could be removed to another jurisdiction, destroyed, or concealed, if advance warning of confiscation were given." 416 U.S. at 679 (emphasis added). The fact that the yacht could be sunk or sailed away was relevant to, but hardly dispositive of, the due process analysis. In any event, land and buildings are subject to damage or destruction. See ante, at 72 (REHNQUIST, C. J., concurring in part and dissenting in part). Moreover, that was just one of the three justifications on which we relied in upholding the forfeiture in Calero-Toledo. The other two -- the importance of the governmental purpose and the fact that the seizure was made by government officials rather than private parties -- are without a doubt equally present in this case, as THE CHIEF JUSTICE's opinion demonstrates. Ante, at 71-72.
 
 III
 
 116
 My second disagreement is with the Court's holding that the Government acted [513] unconstitutionally in seizing this real [77] property for forfeiture without giving Good prior notice and an opportunity to be heard. I agree that the due process inquiry outlined in Mathews v. Eldridge, 424 U.S. 319, 335, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976) -- which requires a consideration of the private interest affected, the risk of erroneous deprivation and the value of additional safeguards, and the Government's interest -- provides an appropriate analytical framework for evaluating whether a governmental practice violates the Due Process Clause notwithstanding its historical pedigree. Cf. Medina v. California, 505 U.S. 437, 453, 120 L. Ed. 2d 353, 112 S. Ct. 2572 (1992) (O'CONNOR, J., concurring in judgment). But this case is an as applied challenge to the seizure of Good's property; on these facts, I cannot conclude that there was a constitutional violation.
 
 
 117
 The private interest at issue here -- the owner's right to control his property -- is significant. Cf. Connecticut v. Doehr, 501 U.S. 1, 11, 115 L. Ed. 2d 1, 111 S. Ct. 2105 (1991) ("The property interests that attachment affects are significant"). Yet the preforfeiture intrusion in this case was minimal. Good was not living on the property at the time, and there is no indication that his possessory interests were in any way infringed. Moreover, Good's tenants were allowed to remain on the property. The property interest of which Good was deprived was the value of the rent during the period between seizure and the entry of the judgment of forfeiture -- a monetary interest identical to that of the property owner in United States v. $ 8,850, 461 U.S. 555, 103 S. Ct. 2005, 76 L. Ed. 2d 143 (1983), in which we stated that preseizure notice and hearing were not required.
 
 
 118
 The Court emphasizes that people have a strong interest in their homes. Ante, at 53-55, 61. But that observation confuses the Fourth and the Fifth Amendments. The "sanctity of the home" recognized by this Court's cases, e.g., Payton v. New York, 445 U.S. 573, 601, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980), is founded on a concern with governmental intrusion into the owner's possessory or privacy interests -- the domain of the Fourth Amendment. Where, as here, the Government obtains a warrant supported by probable cause, that concern is allayed. The [78] Fifth Amendment, on the other hand, is concerned with deprivations of property interests; for due process analysis, it should not matter whether the property to be seized is real or personal, home or not. The relevant inquiry is into the governmental interference with the owner's interest in whatever property is at issue, an intrusion that is minimal here.
 
 
 119
 Moreover, it is difficult to see what advantage a preseizure adversary hearing would have had in this case. There was already an ex parte hearing before a magistrate to determine whether there was probable cause to believe that Good's property had been used in connection with a drug trafficking offense. That hearing ensured that the probable validity of the claim had been established. Cf. Sniadach v. Family Finance Corp. of Bay View, 395 U.S. 337, 343, 23 L. Ed. 2d 349, 89 S. Ct. 1820 (1969) (Harlan, J., concurring). The Court's concern with innocent owners (see ante, at 55-56) is completely misplaced here, where the warrant affidavit indicated that the property owner had already been convicted of a drug offense involving the property. See App. 29-31.
 
 
 120
 At any hearing -- adversary or not -- the Government need only show probable cause that the property has been used to facilitate a drug offense in order to seize it; it will be unlikely that giving the property owner an opportunity to respond will affect the probable-cause determination. Cf. Gerstein v. Pugh, 420 U.S. 103, 121-122, 43 L. Ed. 2d 54, 95 S. Ct. 854 (1975). And we have already held that property owners have a due process right to a prompt postseizure hearing, which is sufficient to protect the owner's interests. See $ 8,850, 461 U.S. at 564-565; Von Neumann, 474 U.S. at 249.
 
 
 121
 The Government's interest in the property is substantial. Good's use of the property to commit a drug offense conveyed all right and title to the United States, although a judicial decree of forfeiture was necessary to perfect [514] the Government's interest. See United States v. Parcel of Rumson, N. J., Land, 507 U.S. 111, 125-127, 113 S. Ct. 1126, 122 L. Ed. 2d 469 (1993) (plurality opinion); cf. Doehr, supra, at 16 (noting that the plaintiff [79] "had no existing interest in Doehr's real estate when he sought the attachment"). Seizure allowed the Government to protect its inchoate interest in the property itself. Cf. Mitchell v. W. T. Grant Co., 416 U.S. 600, 608-609, 40 L. Ed. 2d 406, 94 S. Ct. 1895 (1974).
 
 
 122
 Seizure also permitted the Government "to assert in rem jurisdiction over the property in order to conduct forfeiture proceedings, thereby fostering the public interest in preventing continued illicit use of the property and in enforcing criminal sanctions." Calero-Toledo, 416 U.S. at 679 (footnote omitted); see also Fuentes, 407 U.S. at 91, n.23, citing Ownbey v. Morgan, 256 U.S. 94, 65 L. Ed. 837, 41 S. Ct. 433 (1921). In another case in which the forfeited property was land and buildings, this Court stated:
 
 
 123
 "Judicial proceedings in rem, to enforce a forfeiture, cannot in general be properly instituted until the property inculpated is previously seized by the executive authority, as it is the preliminary seizure of the property that brings the same within the reach of such legal process." Dobbins's Distillery, 96 U.S. at 396, citing The Brig Ann, 13 U.S. 289, 9 Cranch 289, 3 L. Ed. 734 (1815).
 
 
 124
 The Government in Dobbins's Distillery proceeded almost exactly as it did here: The United States Attorney swore out an affidavit alleging that the premises were being used as an illegal distillery, and thus were subject to forfeiture; a federal judge issued a seizure warrant; a deputy United States marshal seized the property by posting notices thereon admonishing anyone with an interest in it to appear before the court on a stated date; and the court, after a hearing at which Dobbins claimed his interest, ordered the property forfeited to the United States. See Record in Dobbins's Distillery v. United States, No. 145, O. T. 1877, pp. 2-8, 37-39, 46-48. The Court noted that "due executive seizure was made in this case of the distillery and of the real and personal property used in connection with the same." 96 U.S. at 396.
 
 
 125
 [80] The Court objects that the rule has its origins in admiralty cases, and has no applicability when the object of the forfeiture is real property. But Congress has specifically made the customs laws applicable to drug forfeitures, regardless of whether the Government seeks to forfeit real or personal property. 21 U. S. C. § 881(d); cf. Tyler v. Defrees, 78 U.S. 331, 11 Wall. 331, 346, 20 L. Ed. 161 (1871) ("Unquestionably, it was within the power of Congress to provide a full code of procedure for these cases [involving the forfeiture of real property belonging to rebels], but it chose to [adopt], as a general rule, a wellestablished system of administering the law of capture"). Indeed, just last Term, we recognized in a case involving the seizure and forfeiture of real property that "it long has been understood that a valid seizure of the res is a prerequisite to the initiation of an in rem civil forfeiture proceeding." Republic Nat. Bank of Miami v. United States, 506 U.S. 80, 84, 121 L. Ed. 2d 474, 113 S. Ct. 554 (1992).
 
 
 126
 Finally, the burden on the Government of the Court's decision will be substantial. The practical effect of requiring an adversary hearing before seizure will be that the Government will conduct the full forfeiture hearing on the merits before it can claim its interest in the property. In the meantime, the Government can protect the important federal interests at stake only through the vagaries of state laws. And while under the current system only a few property owners contest the forfeiture, the Court's opinion creates an incentive and an opportunity to do so, thus increasing the workload of federal prosecutors and courts.
 
 
 127
 For all these reasons, I would reverse the judgment of the Court of Appeals. I therefore respectfully dissent from Part II of the opinion of the Court.
 
 
 128
 [515] JUSTICE THOMAS, concurring in part and dissenting in part.
 
 
 129
 Two fundamental considerations seem to motivate the Court's due process ruling: first, a desire to protect the [81] rights incident to the ownership of real property, especially residences, and second, a more implicitly expressed distrust of the Government's aggressive use of broad civil forfeiture statutes. Although I concur with both of these sentiments, I cannot agree that Good was deprived of due process of law under the facts of this case. Therefore, while I join Parts I and III of the Court's opinion, I dissent from Part II.
 
 
 130
 Like the majority, I believe that "individual freedom finds tangible expression in property rights." Ante, at 61. In my view, as the Court has increasingly emphasized the creation and delineation of entitlements in recent years, it has not always placed sufficient stress upon the protection of individuals' traditional rights in real property. Although I disagree with the outcome reached by the Court, I am sympathetic to its focus on the protection of property rights -- rights that are central to our heritage. Cf. Payton v. New York, 445 U.S. 573, 601, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980) (" Respect for the sanctity of the home . . . has been embedded in our traditions since the origins of the Republic"); Entick v. Carrington, 19 How. St. Tr. 1029, 1066 (C. P. 1765) ("The great end, for which men entered into society, was to secure their property").
 
 
 131
 And like the majority, I am disturbed by the breadth of new civil forfeiture statutes such as 21 U. S. C. § 881(a)(7), which subjects to forfeiture all real property that is used, or intended to be used, in the commission, or even the facilitation, of a federal drug offense. n1 As JUSTICE O'CONNOR [82] points out, ante, at 74-76, since the Civil War we have upheld statutes allowing for the civil forfeiture of real property. A strong argument can be made, however, that § 881(a)(7) is so broad that it differs not only in degree, but in kind, from its historical antecedents. See, e.g., Brief for Respondents 19-21. Indeed, it is unclear whether the central theory behind in rem forfeiture, the fiction "that the thing is primarily considered the offender," J. W. Goldsmith, Jr.-Grant Co. v. United States, 254 U.S. 505, 511, 65 L. Ed. 376, 41 S. Ct. 189 (1921), can fully justify the immense scope of § 881(a)(7). Under this provision, "large tracts of land [and any improvements thereon] which have no connection with crime other than being the location where a drug transaction occurred," Brief for Respondents 20, are subject to forfeiture. It is difficult to see how such real property is necessarily in any sense "guilty" of an offense, as could reasonably be argued of, for example, the distillery in Dobbins's Distillery v. United States, 96 U.S. 395, 24 L. Ed. 637 (1878), or the pirate vessel in Harmony v. United States, 43 U.S. 210, 2 How. 210, 11 L. Ed. 239 (1844). Given that current practice under § 881(a)(7) appears to be far removed from the legal fiction upon which the civil forfeiture doctrine is based, it may be necessary -- in an appropriate case -- to reevaluate our generally deferential approach to legislative judgments in this area of civil forfeiture. n2
 
 
 132
 - - - - - - - - - - - - - - Footnotes - - - - - - - - - -
 
 
 133
 n1 Other courts have suggested that Government agents, and the statutes under which they operate, have gone too far in the civil forfeiture context. See, e.g., United States v. All Assets of Statewide Auto Parts, Inc., 971 F.2d 896, 905 (CA2 1992) ("We continue to be enormously troubled by the government's increasing and virtually unchecked use of the civil forfeiture statutes and the disregard for due process that is buried in those statutes"); United States v. One Parcel of Property, 964 F.2d 814, 818 (CA8 1992) ("We are troubled by the government's view that any property, whether it be a hobo's hovel or the Empire State Building, can be seized by the government because the owner, regardless of his or her past criminal record, engages in a single drug transaction"), rev'd sub nom. Austin v. United States, 509 U.S. 602, 125 L. Ed. 2d 488, 113 S. Ct. 2801 (1993).
 
 
 134
 n2 Such a case may arise in the excessive fines context. See Austin v. United States, 509 U.S. at 628 (SCALIA, J., concurring in part and concurring in judgment) (suggesting that "the relevant inquiry for an excessive forfeiture under [21 U. S. C.] § 881 is the relationship of the property to the offense: Was it close enough to render the property, under traditional standards, 'guilty' and hence forfeitable?").
 
 
 135
 - - - - - - - - - - - - End Footnotes- - - - - - - - -
 
 
 136
 [516] In my view, however, Good's due process claim does not present that "appropriate" case. In its haste to serve laudable goals, the majority disregards our case law and ignores [83] the critical facts of the case before it. As the opinions of THE CHIEF JUSTICE, ante, at 69-72, and JUSTICE O'CONNOR, ante, at 74-76, persuasively demonstrate, the Court's opinion is predicated in large part upon misreadings of important civil forfeiture precedents, especially Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 40 L. Ed. 2d 452, 94 S. Ct. 2080 (1974). n3 I will not repeat the critiques found in the other dissents, but will add that it is twice puzzling for the majority to explain cases such as Springer v. United States, 102 U.S. 586, 26 L. Ed. 253 (1881), and Dobbins's Distillery, supra, as depending on the Federal Government's urgent need for revenue in the 19th century. First, it is somewhat odd that the Court suggests that the Government's financial concerns might justifiably control the due process analysis, see ante, at 59-60, and second, it is difficult to believe that the prompt collection of funds was more essential to the Government a century ago than it is today.
 
 
 137
 - - - - - - - - - - - - - - Footnotes - - - - - - - - - -
 
 
 138
 n3 With scant support, the Court also dispenses with the ancient jurisdictional rule that "a valid seizure of the res is a prerequisite to the initiation of an in rem civil forfeiture proceeding," Republic Nat. Bank of Miami v. United States, 506 U.S. 80, 84, 121 L. Ed. 2d 474, 113 S. Ct. 554 (1992), at least in the case of real property. See ante, at 57-58.
 
 
 139
 - - - - - - - - - - - - End Footnotes- - - - - - - - -
 
 
 140
 I agree with the other dissenters that a fair application of the relevant precedents to this case would indicate that no due process violation occurred. But my concerns regarding the legitimacy of the current scope of the Government's real property forfeiture operations lead me to consider these cases as only helpful to the analysis, not dispositive. What convinces me that Good's due process rights were not violated are the facts of this case -- facts that are disregarded by the Court in its well-intentioned effort to protect "innocent owners" from mistaken Government seizures. Ante, at 55. The Court forgets that "this case is an as applied challenge to the seizure of Good's property." Ante, at 77 (O'CONNOR, J., concurring in part and dissenting in part). In holding that the Government generally may not seize real property prior to a final judgment of forfeiture, see ante, at 59, 62, the [84] Court effectively declares that many of the customs laws are facially unconstitutional as they apply under 21 U.S.C. § 881(d) to forfeiture actions brought pursuant to § 881(a)(7). See, e.g., 19 U.S.C. §§ 1602, 1605 (authorizing seizure prior to adversary proceedings). We should avoid reaching beyond the question presented in order to fashion a broad constitutional rule when doing so is unnecessary for resolution of the case before us. Cf. Ashwander v. TVA, 297 U.S. 288, 347, 80 L. Ed. 688, 56 S. Ct. 466 (1936) (Brandeis, J., concurring). The Court's over-reaching is particularly unfortunate in this case because the Court's solicitude is so clearly misplaced: Good is not an "innocent owner"; he is a convicted drug offender.
 
 
 141
 Like JUSTICE O'CONNOR, I cannot agree with the Court that "under the circumstances of this case -- where the property owner was previously convicted of a drug offense involving the property, the Government obtained a warrant before seizing it, and the residents were not dispossessed -- there was a due process violation simply because Good did not receive preseizure notice and an opportunity to be heard." Ante, at 73-74 (O'CONNOR, J., concurring in part and dissenting in part). Wherever the due process line properly should be drawn, in circumstances such as these, a preseizure hearing is not required as a matter of constitutional law. Moreover, such a hearing would be unhelpful to the property owner. As a practical matter, it is difficult to see what purpose it would serve. Notice, of course, is provided by the conviction itself. In my view, seizure of the property without more formalized notice and an opportunity to be heard is simply one of the many unpleasant collateral consequences that follows from conviction of a serious drug offense. Cf. Price v. Johnston, 334 U.S. 266, 285, 92 L. Ed. 1356, 68 S. Ct. 1049 (1948) ("Lawful incarceration brings about the necessary [517] withdrawal or limitation of many privileges and rights").
 
 
 142
 It might be argued that this fact-specific inquiry is too narrow. Narrow, too, however, was the first question presented [85] to us for review. n4 Moreover, when, as here, ambitious modern statutes and prosecutorial practices have all but detached themselves from the ancient notion of civil forfeiture, I prefer to go slowly. While I sympathize with the impulses motivating the Court's decision, I disagree with the Court's due process analysis. Accordingly, I respectfully dissent.
 
 
 143
 - - - - - - - - - - - - - - Footnotes - - - - - - - - - -
 
 
 144
 n4 "Whether the seizure of the respondent real property for forfeiture, pursuant to a warrant issued by a magistrate judge based on a finding of probable cause, violated the Due Process Clause of the Fifth Amendment because the owner (who did not reside on the premises) was not given notice and an opportunity for a hearing prior to the seizure." Pet. for Cert. I.
 
 
 145
 - - - - - - - - - - - - End Footnotes- - - - - - - - -