**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RICHARD MATHIS, Special
Administrator of the Estate of Joe
Robinson Mathis and as Trustee of
the Joe Robinson Mathis and
Eleanor Margherite Mathis Trust,
AKA Joe R. Mathis; JAMES
MATHIS, individually; ANTHONY
MATHIS, individually,
          *Plaintiffs-Appellees,*

v.

COUNTY OF LYON, a Political
Subdivision of the State of
Nevada,
          *Defendant,*

and

RICHARD GLOVER, individually,
          *Defendant-Appellant.*

No. 08-17302

D.C. No.
2:07-cv-00628-
KJD-GWF

OPINION

Appeal from the United States District Court
for the District of Nevada
Kent J. Dawson, District Judge, Presiding

Argued and Submitted
March 12, 2010—San Francisco, California

Filed February 1, 2011

Before: Procter Hug, Jr. and Jay S. Bybee, Circuit Judges,
and James S. Gwin, District Judge.*

*The Honorable James S. Gwin, United States District Judge for the
Northern District of Ohio, sitting by designation.

Opinion by Judge Hug;
Partial Concurrence and Partial Dissent by Judge Bybee

**COUNSEL**

Keith L. Loomis, Reno, Nevada, for the appellant.

Paola M. Armeni, Las Vegas, Nevada, for the appellees.

**OPINION**

Hug, Circuit Judge:

This case concerns the actions of Richard Glover, the Public Administrator of Lyon County, Nevada, after the death of Joe Mathis. Before us is an interlocutory appeal based only on the allegations in the complaint denying qualified immunity for Glover's actions in entering Joe Mathis's home without a warrant and failing to give notice to his sons before doing so. The complaint makes the following allegations. On May 29, 2008, the deputy sheriff entered Joe Mathis's home on a welfare check and found him dead. He sealed the residence with the property inside. He then notified James Mathis, one of Joe Mathis's three sons. One of the sons, Anthony Mathis, noti-

fied the deputy that he would be coming to Smith Valley, where his father's home is located, on the next available flight and would be arriving on June 1st.

On the evening of May 30th, the deputy contacted Glover in his capacity as Public Administrator and advised him of the death of Joe Mathis. He informed him of the identity of the three sons and that Anthony Mathis would be arriving on the following day, June 1st, to take care of his father's property and funeral. On May 31st, Glover entered the residence and carried away personal property, some of which he stored and some of which he sold.

[1] The Mathis sons alleged that Glover and Lyon County violated their rights under the Fourth and Fourteenth Amendments of the United States Constitution, under the Nevada Constitution and for violations of Nevada state law. Glover and Lyon County moved for summary judgment on the pleadings for the Fourth Amendment allegations. Glover's motion was on the grounds that the complaint revealed that he was entitled to qualified immunity. The district court granted the motion stating:

> Glover is entitled to qualified immunity for the Fourth Amendment claim's relating to his initial entry on the property and securing the property of the estate. However, Glover is not entitled to qualified immunity for claims that he misappropriated property for his own benefit and failed to account for or inventory the property to enable his conversion of the property.

Only the denial of qualified immunity is subject to interlocutory review, not the granting of qualified immunity.[1] Glover maintains we should review the denial of qualified immunity

---

[1]The granting of qualified immunity is reviewed only as a part of an appeal of a final judgment.

based upon the last sentence in the district court's ruling. That sentence is best understood as relating to the allegations of the conversion of property in violation of state law. That interpretation is confirmed by the statement in the Mathis brief that they only base the Fourth Amendment violations upon the initial entry. Thus there is no denial of qualified immunity on the violation of Fourth Amendment rights before us. Glover also is not entitled to qualified immunity on Mathis' claim of a procedural due process violation under the Fourteenth Amendment. The right to notice and hearing prior to a public official's administrative taking of property is clearly established. *See, e.g., Fuentes v. Shevin*, 407 U.S. 67, 82, 97 (1972) (a later hearing does not remedy the prior deprivation in a replevin case); *United States v. James Daniel Good Real Property*, 510 U.S. 43, 53 (1993) ("the right to prior notice and a hearing is central to the Constitution's command of due process" absent extraordinary circumstances).

**[2]** There was no extraordinary circumstance here and the failure to give notice and an opportunity to respond before Glover took the items from the house violated due process. Glover was not entitled to qualified immunity because the law was clearly settled.[2]

AFFIRMED.

---

[2]The dissent would reach the peculiar result of granting qualified immunity to Glover on the due process issue. He dashed into the decedent's home just before one of the decedent's three sons was to arrive to take care of the property, which he well knew. Glover then removed the property and converted it to his own use, selling some of it. The legitimate purpose of "securing" the property does not necessitate the "removal" of the property. It was quite secure in the house. Had notice been given to the sons, and an opportunity to be heard, it is very doubtful that Glover could have removed the property and carried out his plan. The purpose of *Mathews v. Eldridge*, 424 U.S . 319 (1976), would have been well served by the notice and opportunity to respond.

BYBEE, Circuit Judge, concurring in part[1] and dissenting in part:

In the immediate aftermath of Joe Mathis's death, the public administrator of Lyon County, Richard Glover, entered the deceased's residence and secured some of his personal property. He did so under the authority of a state statute that allowed the public administrator to secure the property of the deceased if the administrator found that: (1) "[t]here are no relatives of the deceased who are able to protect the property;" and (2) "[f]ailure to do so could endanger the property." NEV. REV. STAT. § 253.0405 (1999).[2] Subsequently, Joe Mathis's three sons ("Plaintiffs") sued Glover, alleging, inter alia, that Glover violated their Fourteenth Amendment procedural due process rights. Specifically, Plaintiffs alleged that NRS § 253.0405 (the "Nevada statute") was facially unconstitutional because it failed to provide for notice and a hearing prior to the public administrator's securing the property of the deceased.

Although neither the Supreme Court nor any circuit has addressed what process is due to the relatives of a deceased in analogous circumstances—when the deceased has just died, when we don't know yet who stands to inherit the deceased's property, when no one has been appointed to administer the deceased's estate, and when the property deprivation is both temporary and effectuated only to preserve the deceased's estate—the majority cursorily concludes Glover is not entitled to qualified immunity because "[t]he right to notice and a

---

[1]I agree with the majority that the district court granted Glover qualified immunity on the Fourth Amendment search and seizure claims. Accordingly, this part of the district court's ruling is not properly before us. *See Sanchez v. Canales*, 574 F.3d 1169, 1172 (9th Cir. 2009) ("The district court's grant of qualified immunity . . . is not independently interlocutorily appealable.").

[2]Both conditions are no longer required. The statute was amended in 2009 and, under the current statute, a public administrator may secure property when either condition is met.

hearing prior to a public official's administrative taking of property is clearly established." Maj. Op. at 2039.

The majority has erred at each step of the qualified immunity analysis.[3] First, the majority erred by holding that the Constitution requires predeprivation notice and a hearing before a public administrator secures the property of the deceased. And second, it erred by holding that the right to predeprivation notice and a hearing—in the particular context of a public administrator securing the property of the deceased—was so clearly established at the time of the alleged violation that Glover should have known his conduct was illegal. I respectfully dissent.

I

Fourteenth Amendment procedural due process analysis proceeds in two steps: "the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (internal citations omitted). I consider each step in turn.

A

"The types of interests that constitute . . . 'property' for Fourteenth Amendment purposes are not unlimited; the interest must rise to more than an abstract need or desire and must be based on more than a unilateral hope. [A]n individual claiming a protected interest must have a legitimate claim of

---

[3]When evaluating whether qualified immunity protects a state official, we generally engage in a two-step analysis. First, we consider "whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the [state official's] conduct violated a constitutional right." *Krainski v. Nevada ex rel. Bd. of Regents*, 616 F.3d 963, 968 (9th Cir. 2010). If so, we consider "whether the right was clearly established in light of the specific context of the case." *Id.*

entitlement to it." *Id.* (internal quotation marks and citations omitted).

Here, Plaintiffs posit two property interests: an ownership interest in their own personal property that they stored at their father's residence and an interest in their father's personal property as devisees under Joe Mathis's will. Although the first interest is clearly a cognizable property interest under the Fourteenth Amendment, determining whether heirs have "a legitimate claim of entitlement," *id.*, to property devised to them under a will presents a more complicated question. The heirs' interest as devisees under a will is fundamentally different from a simple ownership interest. As devisees under a will, the heirs do not acquire a *possessory* interest in the decedent's property until the personal representative of the decedent's estate administers the estate, settles its debts, and delivers the remaining property to the heirs. *See* NEV. REV. STAT. § 143.020 (2009). Thus, while it is immediately apparent that an *ownership* interest in property vests the moment the owner acquires the property, the heirs' interest in property devised under a will may not vest until the will is probated and the estate is administered. *See* 80 AM. JUR. 2d *Wills* § 1289 (2002) (stating that although in some jurisdictions "a devisee becomes vested with the same right to, and interest in, the devised property [upon the death of the testator] . . . it has also been held that upon the death of the testator, all property, whether real or personal, passes directly to the personal representative, who holds legal title throughout the period of administration and distribution of the estate").

Nevada courts have held that "the title to real estate vests in the heirs of devisees at the moment of the death of [the] testator . . . subject only to the lien of the [personal representative] for the payment of the debts and expenses of administration." *Wren v. Dixon*, 161 P. 722, 732 (Nev. 1916). Under this authority, the heirs' interest in the decedent's *real* property as devisees clearly qualifies as a property interest under the Due Process Clause. However, *Wren* is not dispositive

here because Plaintiffs assert an interest in the decedent's *personal* property. So far as I can determine, Nevada courts have not addressed whether legal title to *personal* property devised under a will also vests in the devisees upon the testator's death. Nevertheless, even assuming that legal title does not vest immediately upon the testator's death and that the heirs thus have a temporary inchoate interest, this inchoate interest likely gives the heirs a legitimate claim of entitlement to the deceased's property. *See Allan v. Allan*, 223 S.E.2d 445, 449 (Ga. 1976) ("Even though the right is inchoate rather than vested, it is a legal right that will be protected. . . . [W]e hold that the defendant's interest in the real property as a devisee under the will is a legally protected interest [under the Due Process Clause]."); *cf. In re Chenoweth*, 3 F.3d 1111, 1112-13 (7th Cir. 1993) (holding that a devisee under a will acquires an entitlement to the devised property within the meaning of 11 U.S.C. § 541(a)(5)(A) upon the death of the testator). Accordingly, I am willing to assume that Plaintiffs also have a constitutionally cognizable interest in their father's personal property as devisees under the will. I now turn to the second step of the procedural due process analysis.

B

To determine what procedural protections the Constitution requires before a public administrator enters the residence of a deceased and secures the deceased's property, we balance (1) the private interest affected by the official action; (2) the risk of erroneous deprivation and the probable value of additional procedural safeguards; and (3) the governmental interest, including the fiscal and administrative burdens of additional procedures. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). First, the private interest affected by a public administrator's actions is minimal because, as discussed above, a decedent's relatives do not have the right to possess the decedent's personal property until the decedent's estate is administered. *See* NEV. REV. STAT. § 143.020. Thus, under Nevada's statutory scheme, the property deprivation Plaintiffs

complain of occurs—and terminates—before a decedent's relatives are entitled to possess the decedent's property.

Furthermore, this deprivation also occurs in the immediate aftermath of the decedent's death, when Nevada law does not even tell us who has the right to the possession of the decedent's property. Although "a personal representative has [the] right to the possession of all the . . . property of the decedent . . . until the estate is settled, or until delivered over by order of the court to the heirs or devisees," *id.*, "[n]o person has any power as a personal representative until [the court directs issuance of letters testamentary]." *Id.* § 138.010. If the decedent's estate must be administered in the interim, the probate court can appoint a special administrator. *See* NEVADA CIVIL PRACTICE MANUAL § 34.21 (Jeffrey W. Stempel et al. eds., 2010) ("Special administrators are generally appointed . . . where [a personal representative] has not yet been appointed, and exigencies make it necessary to take prompt actions to marshal assets or otherwise preserve the estate."). However, in the short period between the death of a decedent and the appointment of a personal representative or a special administrator by the probate court, it is unclear who—if anyone—has the legal right to the possession of the decedent's property. The Nevada statute foresees this limbo period by specifying that the public administrator may secure the property of the deceased "[b]efore the issuance of the letters of administration for an estate." NEV. REV. STAT. § 253.0405. The role of a public administrator in Nevada anticipates the uncertainty of who may possess—and thus preserve and protect—the decedent's property in the immediate aftermath of the decedent's death.

The facts of this case confirm that the private interest affected by a public administrator's securing property is minimal. Here, Plaintiffs did not have the right to the possession of their father's property immediately after his death. At the time Glover entered the residence, not only had letters testamentary not been issued to the personal representative of the estate, but the decedent's will also did not name any of the

Plaintiffs as personal representatives of the estate. Additionally, Richard Mathis—one of the deceased's sons—was not appointed special administrator of the estate until well after Glover entered the residence. Accordingly, at the time Glover entered the residence, Plaintiffs had only a future interest in the decedent's personal property; Plaintiffs were potential beneficiaries who stood to inherit under the terms of their father's will after the estate was administered. Given the attenuated nature of this interest, the first *Mathews* factor does not support predeprivation process in the particular context of a public administrator securing the property of the deceased.[4]

Second, although a predeprivation hearing could reduce the risk of a public administrator erroneously securing the decedent's property, the value of predeprivation process is minimal because such process may jeopardize the very property a public administrator seeks to preserve. Under the Nevada statute, a public administrator may secure the property of the deceased only in exigent circumstances, i.e., if the administrator finds that there are no relatives of the deceased able to secure the property and if failure to secure the property could endanger it. *See* NEV. REV. STAT. § 253.0405 (1999). Thus, once the public administrator makes the required statutory determination, he must out of necessity act quickly to preserve the decedent's estate. If, however, the public administrator must conduct a hearing before securing property that is in danger of being lost, the purpose of the statute is defeated: conducting that very hearing may well prevent the public administrator from securing the endangered property before it

---

[4]Plaintiffs would have a significant property interest in any personal property that they themselves owned and stored at their father's residence. Here, for example, Plaintiffs claimed that some of the firearms and ammunition in their father's house were actually theirs. However, Glover could not have known that some of the property located in the deceased's residence actually belonged to the Plaintiffs. For purposes of securing the property, a public administrator is certainly entitled to presume that the property inside a decedent's residence is, in fact, the decedent's property.

is lost.[5] Accordingly, the second *Mathews* factor does not support predeprivation process in the particular context of a public administrator securing the property of the deceased.

The facts of this case confirm this conclusion. When Glover entered the residence, the deceased's sons were unable to secure their father's property because they were not physically present in Lyon County. Accordingly, a predeprivation hearing could have reduced only the risk that Glover secured the deceased's property when the deceased's property was not actually in danger. Given that none of the Plaintiffs resided in Lyon County—one lived in Clark County while the other two lived out-of-state—the public administrator, who was on the spot, was in the best position to make this crucial determination in light of the particular conditions of the locality where the deceased had lived. I do not see how the opinion of relatives who are not around to secure the deceased's property—or to even assess for themselves whether the property is in danger and should be secured—would inform the public administrator's decision to secure the decedent's property.

Third, the government has a substantial interest in preserving a decedent's estate both because safeguarding property directly affects the welfare of its citizens (if the decedent's property is lost, the assets of the decedent's beneficiaries are diminished and the estate's creditors may go unpaid) and because the decedent's property may, in certain circumstances, escheat to the state. Additionally, the administrative burden of determining who is entitled to predeprivation process in the immediate aftermath of the decedent's death—perhaps the only time when the property of the deceased may

---

[5]Furthermore, Nevada law effectively "insures" the deceased's estate against loss for the temporary period in which the public administrator secures the deceased's property by requiring the public administrator, prior to taking his oath for office, to "[g]ive an official bond in an amount not less than $10,000, as required and fixed by . . . his or her county . . . , unless a blanket fidelity bond is furnished by the county." Nev. Rev. Stat. § 253.020.

need to be secured—is great. For example, the public administrator would have to investigate the deceased's family history, determine whether the deceased died testate or intestate, and, when appropriate, examine the decedent's will to ascertain the identity of the named executors and beneficiaries, all at a time when the documents the public administrator needs —such as the decedent's will—may not be readily available.[6] Thus, because of the government's strong interest in preserving the decedent's estate and the impracticality of determining who has an interest in that estate in the immediate aftermath of a decedent's death, the third *Mathews* factor does not support predeprivation process.

Upon weighing the *Mathews* factors, I cannot conclude that a public administrator is constitutionally required to give notice and a hearing before securing the property of the deceased when no one else can do so and when that property is in danger of being lost. Although "traditionally . . . [an] opportunity for [a] hearing must be provided before the deprivation at issue takes effect," *Fuentes v. Shevin*, 407 U.S. 67, 82 (1983), a predeprivation hearing is not required in all circumstances. For example, where a state must of necessity act quickly, *see Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982), where providing predeprivation process is impracticable, *id.*, or "where the potential length or severity of the deprivation does not indicate a likelihood of serious loss and where the procedures underlying the decision to act are sufficiently reliable to minimize the risk of erroneous determination," *Memphis Light, Gas, & Water Div. v. Craft*, 436 U.S. 1, 19 (1978), postdeprivation process may satisfy the Constitution. When a public administrator secures the property of a deceased, he must of necessity act quickly to preserve the decedent's estate; he cannot immediately tell who

---

[6]While the public administrator must eventually investigate "[w]hether there are beneficiaries named on any asset of the estate," NEV. REV. STAT. § 253.0415, Nevada law sensibly does not require that this investigation occur before securing the estate's assets.

has an interest in the property; and he effects a property deprivation of the most benign kind, a deprivation that is both temporary and that actually prevents the property's permanent loss. In such a case, postdeprivation process is all that is required.

The majority cites two cases to support its opposite conclusion, but these cases are easily distinguishable. In *Fuentes*, the Supreme Court addressed the constitutionality of two state statutes "authorizing the summary seizure of . . . chattels in a person's possession under a writ of replevin . . . simply upon the ex parte application of any other person who claim[ed] a right to them and post[ed] a security bond." 407 U.S. at 69-70. The Court held these statutes "work[ed] a deprivation of property without due process of law [because] they den[ied] the right to a prior opportunity to be heard before chattels [were] taken from their possessor." *Id.* at 96. Similarly, in *United States v. James Daniel Good Real Property*, 510 U.S. 43 (1993), the Court held that, "in the absence of exigent circumstances, [due process] prohibits the Government in a civil forfeiture case from seizing [the owner's home] without first affording the owner notice and an opportunity to be heard." *Id.* at 46. Neither case, however, involved a seizure justified by exigent circumstances (i.e., a danger that the property in question could be lost unless seized) and, correspondingly, "a pressing need for prompt action." *Id.* at 56.

I would hold that the Due Process Clause of the Fourteenth Amendment does not require a pre-seizure hearing in the circumstances addressed by the Nevada statute: where a public administrator must act quickly to secure the property of the decedent in order to preserve it for the decedent's heirs. Consequently, I would uphold NRS § 253.0405 (1999) against a facial challenge.[7]

---

[7]The majority's only response—that Glover "dashed into the decedent's home just before one of the decedent's three sons was to arrive . . . and converted [the property] to his own use, selling some of it"—is irrelevant.

II

Even assuming Plaintiffs had a constitutional right to pre-deprivation notice and a hearing, it is hard to fathom that right was—and still is—clearly established. "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation marks omitted). Although an official may violate clearly established law "even in novel factual circumstances . . . the salient question . . . is whether the state of the law [at the time of the alleged violation] gave [that official] fair warning that [his conduct] was unconstitutional." *Id.* at 741.

Here, the state of the law at the time Glover entered Joe Mathis's residence did not give Glover fair warning that he was violating the Constitution, for two reasons. First, there was—and still is—no case law balancing the *Mathews* factors in the particular context of a public administrator's securing the property of the deceased. And second, Plaintiffs' procedural due process rights were not derivative of a bright-line constitutional rule, but rather depended on a complicated balancing test whose outcome was—at best—uncertain. Accordingly, I would, at the very least, grant Glover qualified immunity. *See Humphries v. Cnty. of Los Angeles*, 554 F.3d

Maj. Op. at 2039 n.2. Of course, if Glover stole the property of the deceased he should be liable to Joe Mathis's estate under a state law action for conversion; he should be criminally prosecuted as well. But whether Glover "dashed into the decedent's home" and "converted [the property] to his own use" doesn't really matter when the Plaintiffs have brought a facial challenge to the Nevada statute. *See United States v. Kaczynski*, 551 F.3d 1120, 1124 (9th Cir. 2009) ("A facial challenge to a [statute] is . . . the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [statute] would be valid." (alterations in original) (quoting *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987))).

1170, 1202 (9th Cir. 2009) ("A procedural due process analysis that requires a complicated balancing test is sufficiently unpredictable that it was not unreasonable for [a state official] to comply with [constitutionally-inadequate statutory] provisions."), *overruled on other grounds by Los Angeles Cnty., Cal. v. Humphries*, 131 S. Ct. 447 (2010); *Brewster v. Bd. of Educ. of the Lynwood Unified Sch. Dist.*, 149 F.3d 971, 983 (9th Cir. 1998) ("[B]ecause procedural due process analysis essentially boils down to an ad hoc balancing inquiry, the law regarding procedural due process claims can rarely be considered clearly established at least in the absence of closely corresponding factual and legal precedent." (internal quotation marks and citations omitted)). I don't know how we could expect Glover to have anticipated that, by following Nevada law, he was violating the Fourteenth Amendment.

\* \* \* \* \*

Unlike the "broadly drawn" prejudgment replevin statutes in *Fuentes* which did not "limit the summary seizure of goods to special situations demanding prompt action," the Nevada statute is "narrowly drawn to meet . . . unusual condition[s]." *Fuentes*, 407 U.S. at 93 (citation omitted). It authorizes property seizures only in exigent circumstances: when the property of the deceased is in danger of being lost and when no one is able to protect it. I would thus uphold the Nevada statute because it applies only to "extraordinary situations" creating "a special need for very prompt action that justifie[s] the postponement of notice and hearing until after the seizure." *James Daniel Good Real Prop.*, 510 U.S. at 52-53. Alternatively, I would grant Glover qualified immunity against Plaintiffs' facial challenge. I respectfully dissent.